David Michael MURR, Petitioner,

v.

John MARSHALL, Warden,
Respondent.

No. EDCV 04–1380–TJH (MAN).

United States District Court,
C.D. California.

Nov. 25, 2009.

Roger S. Hanson, Roger S. Hanson Law Offices, Santa Ana, CA, for Petitioner.

Amanda Lloyd, Collette C. Cavalier, Nicholas N. Paul, CAAG–Office of the Attorney General, Los Angeles, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

TERRY J. HATTER, JR., District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition for Writ of Ha-

beas Corpus, all of the records herein, the Report and Recommendation of United States Magistrate Judge, Respondent's Objections ("Objections"), and Petitioner's Response to Respondent's Objections. The Court has conducted a *de novo* review of those matters to which objections have been made.

■ Respondent argues that, to the extent the Magistrate Judge's conclusion that the Governor's decision is not supported by "some evidence" rests on the absence of a nexus between Petitioner's commitment offense and his current dangerousness, the Magistrate Judge is applying state law rather than clearly established federal law. (*See* Objections at 4–8). The Court rejects this argument. The Magistrate Judge applied the "some evidence" standard set forth by the Supreme Court in *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), which constitutes the clearly established federal law in this area. Pursuant to *Irons v. Carey,* 505 F.3d 846, 851 (9th Cir. 2007), the Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill.*" In *In re Lawrence,* 44 Cal.4th 1181, 1210, 82 Cal.Rptr.3d 169, 189, 190 P.3d 535 (2008), the California Supreme Court clarified that California law requires a rational nexus between factors indicating unsuitability and the determination of current dangerousness. Thus, a federal court's application of the *Hill* "some evidence" standard is informed by the California Supreme Court's explication in *Lawrence* of what evidence is necessary under California law to support the Board's or the Governor's decision that an inmate is unsuitable for parole.

Moreover, in *Lawrence,* the California Supreme Court made clear that it was merely clarifying existing California law. *See In re Lawrence,* 44 Cal.4th at 1227, 82 Cal.Rptr.3d at 203, 190 P.3d 535 ("The relevant determination by the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate."). Thus, it is irrelevant that *Lawrence* was handed down after the Governor issued his decision regarding Petitioner's suitability for parole, and after the state court applied the "some evidence" standard to the Governor's decision.

■ Respondent contends that, even if Petitioner is entitled to habeas relief, the proper relief is a new review by the Governor comporting with due process. (Objections at 9–10.) Respondent cites the Ninth Circuit's recent decision in *Chioino v. Kernan,* 581 F.3d 1182, 1186 (9th Cir.2009), in which the Ninth Circuit held that the proper remedy for Sixth Amendment error under *Cunningham v. California,* 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), is remand to the state trial court for re-sentencing. However, unlike a state trial court's sentencing authority under California's new discretionary sentencing scheme, the Governor's authority with respect to parole decisions is limited. The Governor may only review the evidence that was before the Board of Parole Hearings ("Board") at the time it rendered its decision and must base his decision on that evidence. Cal. Const. art. V, § 8(b); *see also* Cal.Penal Code § 3041.2. Thus, when a court has concluded that the record does not contain "some evidence" to support the Governor's determination that an inmate is unsuitable for parole, a remand to the Governor would not serve any purpose, and the proper disposition is to reinstate the Board's decision and, if the release date set by the Board has passed, to order

the inmate's release. *See In re Dannenberg*, 173 Cal.App.4th 237, 256–57, 92 Cal. Rptr.3d 647, 661–62 (2009); *In re Vasquez*, 170 Cal.App.4th 370, 386, 87 Cal.Rptr.3d 853, 863–64 (2009).

■ Respondent further argues that reinstatement of the Board's August 27, 2003 decision is an improper remedy in this case, because the Board subsequently found Petitioner unsuitable for parole at five consecutive parole hearings. (Objections at 11.) Respondent neither mentions the basis for these findings nor indicates whether they rested on new evidence. As set forth above, the Governor cannot consider evidence that was not before the Board in connection with the decision that he is reviewing, *i.e.,* the August 27, 2003 decision. If new evidence supports a conclusion that Petitioner poses a current danger to society and is unsuitable for parole, nothing in this Court's order reinstating the Board's August 23, 2003 decision precludes the Board from invoking its power to rescind Petitioner's parole based on events occurring subsequent to its decision. *See* Cal.Penal Code §§ 3041.5, 3041.7; Cal.Code Regs., tit. 15, § 2450.

Having completed its review, the Court accepts and adopts the Magistrate Judge's Report and Recommendation and the findings of fact, conclusions of law, and recommendations therein.

IT IS ORDERED that the Petition is DENIED based on Grounds One, Four, and Six and is GRANTED based on Grounds Two, Three, and Five. A writ of habeas corpus shall issue as follows: The Board's August 27, 2003 decision finding Petitioner suitable for parole is reinstated. Within thirty (30) days, the Board shall calculate a parole release date for Petitioner in accordance with California law. If the release date has passed, Respondent shall, within ten (10) days after the parole release date is calculated, either release Petitioner from custody, if the release date

lapsed more than three years earlier, or release Petitioner on parole, subject to the conditions of parole imposed at his August 27, 2003 hearing, for that period of his three-year parole term that remains if the release date lapsed less than three years earlier.

IT IS FURTHER ORDERED. that the Clerk shall serve copies of this Order and the Judgment herein on counsel for Petitioner and counsel for Respondent.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MARGARET A. NAGLE, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Terry J. Hatter, Jr., United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 05–07 of the United States District Court for the Central District of California.

### INTRODUCTION

Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on November 2, 2004 ("Petition"). Respondent filed an Answer and lodged the state record ("Lodg."), and Petitioner filed a Traverse. Subsequently, Petitioner filed several notices of newly issued authorities. Pursuant to the Court's orders directing supplemental briefing, Respondent filed a Supplement to Return, Petitioner filed a Supplement to Traverse, and Respondent filed Respondent's Supplemental Brief.

The matter is submitted and ready for decision.

## PRIOR PROCEEDINGS

On October 12, 1977, a San Bernardino County Superior Court jury convicted Petitioner of: (1) one count of first degree murder (California Penal Code § 187); (2) two counts of robbery (California Penal Code § 211); and (3) one count of burglary (California Penal Code § 459). (Lodg., Ex. 1.) On November 2, 1977, the trial court sentenced Petitioner to seven years to life in state prison. (*Id.*)

Petitioner was received by the California Department of Corrections on November 10, 1977. (Petition, Ex. A [Transcript of Subsequent Parole Consideration Hearing on August 27, 2003; Decision] at 1.) Petitioner's minimum eligible parole date was June 14, 1984. (*Id.*)

Petitioner received an initial parole consideration hearing before the Board of Prison Terms (the "Board")[1] on July 7, 1983, and was found unsuitable for parole. (Lodg., Ex. 3 [California Department of Corrections Chronological History] at 1.) Petitioner was found unsuitable for parole at four subsequent parole hearings. (*Id.*) On September 19, 1991, the Board found Petitioner suitable for parole, with a parole date of November 14, 1994. (*Id.* at 2; Petition, Ex. C at 40–42.)

In 1992, the Board held two rescission hearings regarding Petitioner's parole, and his parole date was reaffirmed both times. (Lodg., Ex. 3 at 2.) On September 29, 1993, the Board held a progress hearing at which Petitioner's parole date was advanced by eight months to March 14, 1994. (*Id.*) According to Albert M. Leddy, one of the commissioners on the panel that found Petitioner suitable for parole, when Petitioner's parole date arrived, the Board directed prison authorities to retain him in prison pending yet another rescission hearing. (Petition, Ex. E [Declaration of Albert Leddy, dated January 14, 2002 ("Leddy Decl.")] ¶¶ 7, 8, 9.)[2] It was not until April 19, 1995, that a panel of the Board, with one panel member dissenting, rescinded the 1991 grant of parole as improvidently granted.[3] (*Id.* at ¶ 10, Ex. D; Lodg., Ex. 3.)

Petitioner was found unsuitable for parole at subsequent parole consideration hearings in 1996, 1997, and 1998. (Lodg., Ex. 3 [Department of Corrections Chronological History] at 3.) On April 25, 2001, the Board again found Petitioner suitable for parole. (*Id.* at 4.) On July 31, 2001, then-Governor Gray Davis reversed the Board's decision. (*Id.*)

Petitioner pursued habeas relief from the Governor's decision in the San Bernardino County Superior Court. (*See* Petition, Ex. H at 1.) On July 17, 2003, the state court granted Petitioner habeas relief and ordered the Governor either to consider all factors pertinent to suitability specified by applicable California regulations or to set aside his reversal of the Board's decision. (*Id.*) Governor Davis is-

---

1. Effective July 1, 2005, the Board of Prison Terms was abolished and was replaced by the Board of Prison Hearings. California Penal Code § 5075(a). The Court will refer to both as "the Board."

2. Leddy recused himself from participation in Petitioner's rescission hearings, because Leddy did not believe there were any grounds for holding such hearings. (Leddy Decl. ¶ 9.)

3. Petitioner challenged the 1995 rescission in state court. On September 14, 1995, Petition-er filed a habeas petition in the California Court of Appeal, which that court denied on December 15, 1995. On January 6, 1997, he filed a habeas petition in the California Supreme Court, which that court denied on June 11, 1997. (Petition at 19; Lodg., Exs. 12, 13, and 14 [Declaration of B. Modkins, dated February 3, 2005 ("Modkins Decl.")] ¶ 2.) The parties have not provided to the Court copies of those habeas petitions and resulting judicial decisions. (*See* Modkins Decl. ¶¶ 3, 4.)

**1038**

sued a new decision, again reversing the Board's grant of parole. (Petition, Ex. O at 301–02 [Governor Davis's decision dated August 14, 2003].)

On August 27, 2003, Petitioner and his counsel appeared at another parole consideration hearing. (Petition, Ex. A at 1.) At the conclusion of the hearing, the Board again found that Petitioner was suitable for parole. (*Id.* at 65–70.) On January 23, 2004, Governor Arnold Schwarzenegger reversed the Board's decision. (Petition, Ex. B ["Governor's Decision"].)

Petitioner filed a habeas petition in the San Bernardino County Superior Court. (Lodg., Ex. 6.) On May 10, 2004, the Superior Court denied relief in a reasoned decision. (Petition, Ex. H; Lodg., Ex. 7.) Petitioner filed a habeas petition in the California Court of Appeal. (Lodg., Ex. 8.) On July 15, 2004, the California Court of Appeal summarily denied relief. (Petition, Ex. I; Lodg., Ex. 9.) Petitioner filed a petition for review in the California Supreme Court. (Lodg., Ex. 10.) On October 20, 2004, the California Supreme Court summarily denied the petition. (Petition, Ex. J; Answer, Ex. 11.)

## BACKGROUND

### A. *Commitment Offense*

The following description of Petitioner's commitment offense is taken from the Governor's Decision:

On June 9, 1977, John Sequeira took his three children out for the evening. The children's live-in baby sitter, Joann Whitley, and her boyfriend, Wayne Johnson, stayed at the Sequeira[s'] San Bernardino residence. At approximately 8:00 p.m., Ms. Whitley heard a knock at the front door and went to answer. Someone asked, "Is John there?" Before she could reply, the front door was forced open and [Petitioner] entered with two crime partners.

One of the men grabbed Ms. Whitley by the hair and spun her around so that she could not see them, then placed a knife to her throat. She was pushed to the couch where [Petitioner] blindfolded her and tied her hands and feet with wire. The men asked her where John was. When she replied that he was not there, they told her it was a robbery and to keep quiet or she would be killed.

The men went to the bedroom where Mr. Johnson was sleeping. They woke him. After a brief struggle, he was stabbed twice and died within a few minutes. The three returned to the living room and demanded that Ms. Whitley tell them where the money and drugs were. She said she did not know what they were talking about. The three then ransacked the house, saying they would kill Mr. Sequeira when he returned.

[Petitioner] and his crime partners held Ms. Whitley for about an hour before Mr. Sequeira returned home with his three children. They were met at the door by [Petitioner], who pointed a gun at them and ordered them to lie on the floor. One of the attackers held a six to eight inch knife to Mr. Sequeira's chin and demanded money and drugs. Mr. Sequeira denied knowing what they were talking about. He was blindfolded and tied. One of the men kicked him and the three threatened to kill him. After a time, Ms. Whitley was untied and ordered to watch the children, who were crying hysterically.

Mr. Sequeira was taken into the bedroom and shown Mr. Johnson's body and stab wounds. He was then led back into the living room. Money was taken from his pockets and from Ms. Whitley's purse. The men then beat and threatened Mr. Sequeira again. One of his captors rubbed a knife across Mr. Sequeira's back, threatening to return.

Mr. Sequeira was told that the three had planned the robbery for a year. The three then left.

(Petition, Ex. B at 1.)

### B. *The August 27, 2003 Parole Hearing*

At Petitioner's August 27, 2003 parole hearing, the Board incorporated by reference the description of Petitioner's commitment offense in a 1999 Board report.[4] (Petition, Ex. A at 9.) The Board then questioned Petitioner regarding his commitment offense. (*Id.*) Petitioner confirmed that he is serving a sentence for the murder of Wayne Johnson during a home invasion robbery for drugs and money. (*Id.*) He stated that he did not have a knife and did not put a knife to Whitley's throat or stab Johnson. (*Id.* at 10.) Petitioner believed that Johnson was killed by Matthews, one of the three crime partners, because he was the only one with a knife. (*Id.*) Petitioner admitted that he tied Whitley up with speaker wires he found behind the couch. (*Id.* at 51.) He was tying her up when Matthews and the other crime partner went to the bedroom, and he was not with them when Johnson was stabbed. (*Id.*) He said that he never left Whitley's side. (*Id.*)

Petitioner admitted that he had a shotgun, which he found in Sequeira's house, and when Sequeira and his children came home and the children became hysterical, he took Whitley and the children to another room and guarded them with the shotgun. (Petition, Ex. A at 11, 44, 51–52.) He was guarding Whitley and the children while Sequeira was beaten up and did not participate in the beating. (*Id.* at 11.) Petitioner stated that when he and his confederates left the house, he did not yet know that anyone had been stabbed. (*Id.* at 44.)

Petitioner was using a variety of drugs at that time and had used heroin and marijuana on the day of the crime. (Petition, Ex. A at 12, 13, 20–22, 45–46.) The robbery of the Sequeira residence was planned almost a year in advance. (*Id.* at 39.) Matthews met Sequeira in jail and learned that Sequeira was a drug dealer with a large supply of drugs. (*Id.* at 39–40.) Petitioner had just been released from jail and had moved to Oregon. (*Id.* at 40.) Matthews wrote to him, asking him to participate in robbing Sequeira. (*Id.*) Petitioner agreed and came back to California. (*Id.*)

The Board reviewed Petitioner's criminal history. (Petition, Ex. A at 14.) In 1969 and 1971, Petitioner sustained juvenile arrests for burglary and trespass and juvenile convictions for auto tampering, violation of curfew, and burglary. (*Id.*) As an adult, he sustained a 1973 conviction for robbery and assault with a deadly weapon and a 1975 conviction for receiving stolen property. (*Id.* at 14–15; *see also* Lodg., Ex. 2.) Petitioner explained that the robbery and assault convictions arose from a bar fight involving a large number of people, one of whom later said that his wallet had been taken. (Petition, Ex. A at 15–16.)

Petitioner's father was an alcoholic who beat Petitioner as a child and once accidentally shot Petitioner in the hand. (Petition, Ex. A at 17–19.) At the time of the commitment offense, Petitioner was married and had two children, with a third on the way. (*Id.* at 19, 41; Answer, Ex. 2 at 2.) After three marriages (two of them to the same woman) ended in divorce, Petitioner married his present wife in 1989. (*Id.* at 20.)

In prison, Petitioner sustained 11 "115" disciplinary violations, but none had been

---

4. The Board did not summarize the report, and it has not been provided to the Court.

sustained since 1987. (Petition, Ex. A at 32.) He sustained six "128" counseling "chronos," the last of which was sustained in 1991. (*Id.*) In 1979, Petitioner was involved in the prison stabbing of his crime partner, Matthews. (*Id.* at 36.) Matthews was not convicted of Johnson's murder, because he was tried separately from Petitioner and two juries failed to reach a verdict, but he was in prison for a different crime. (*Id.* at 36; *see* Petition, Ex. C [Transcript of Subsequent Parole Consideration Hearing on September 19, 1991] at 7–8.) At the request of some Mexican Mafia inmates, who wanted to stab Matthews on account of something he had done while in jail, Petitioner smoked marijuana with Matthews until the inmates came to stab him. (Petition, Ex. A at 36.)

Petitioner used drugs in prison but stopped in 1983, except for one "half a joint" that he smoked in 1988. (Petition, Ex. A at 37.)

Petitioner has participated in numerous self-help, recovery, religious, educational, and vocational courses and activities, and has received many laudatory "chronos" and letters commending him for his accomplishments, attitude, work ethic, honesty, and positive contributions to prison life.[5] (Petition, Ex. A at 28–31.) He teaches Bible classes, is a group leader in the drug counseling program, volunteers for the literacy program, works with the mentally ill, and at the time of the hearing had for nine years voluntarily resided in an undesirable part of the prison so that he could help re-open the canteen there and minis-ter to the inmates as an inmate pastor. (*Id.* at 29–31, 46.)

The Board also reviewed Petitioner's evaluations by his correctional counselor and the staff psychologist. The correctional counselor concluded that, considering Petitioner's commitment offense, prior record, and adjustment in prison, he would pose a low degree of threat to the community if released. (Petition, Ex. A at 32.) The staff psychologist concluded that Petitioner would pose a moderate level of risk for future violence if released. (*Id.* at 33–35.) The psychologist acknowledged that Petitioner's current factors, such as his understanding of his crime, his attitude, and his programming, were all positive, but concluded that the historical factors, such as the nature of the crime and Petitioner's past criminal history and drug use, warranted a "moderate" risk level even though Petitioner had abstained from drugs and misconduct for a substantial period of time.[6] (*Id.*)

Petitioner planned to live in Porterville, California, with his wife, who is a director of education at the Tulare Indian Reservation. (Petition, Ex A. at 22, 64.) He had offers of residence from his wife and other persons, letters of support from friends, relatives, and his two ex-wives, and two job offers from companies in Porterville. (*Id.* at 23–27.)

Petitioner acknowledged that, because of his participation in the robbery, he was "totally responsible for the life that was taken," and expressed his shame and re-

---

**5.** Petitioner's vocational and educational accomplishments are described in greater detail in the discussion of the Governor's Decision, *infra.*

**6.** The staff psychologist stated:
In[asmuch] as past behavior is a strong predicator [*sic* ] of future behavior, it cannot be ignored or eliminated as a result of a substantial period which is free from crimi-nal behavior. Similarly, past psychoactive substance abuse cannot be ignored because of a period of continuous abstinence, particularly in a controlled setting. Consequently, the most objective conclusion for this subject is that there is a moderate level of risk for future violence in the free community.
(Petition, Ex. A at 33–34.)

morse over his actions. (Petition, Ex. A at 12–13, 44–45.) Asked by his counsel about his ability to cope with stress if released from prison, Petitioner stated that he had learned to handle stress through coping with volatile and mentally unstable prison inmates and the repeated disappointment of having his parole date taken away. (*Id.* at 48, 49.)

A representative from the San Bernardino District Attorney's Office spoke in opposition to Petitioner's release. He acknowledged that Petitioner has "done a lot of very good things within the prison," but stressed the nature of the crime, Petitioner's criminal history and drug use, and his disciplinary record during his early years of incarceration. (Petition, Ex. A at 52–57.) The district attorney also argued that, given the length of time that Petitioner spent in Sequeira's house, his contention that he did not learn of the killing until later was not credible, especially since the Probation Report identified Petitioner as the man who showed Johnson's dead body to Sequeira. (*Id.* at 54.)

### C. *Board Decision*

The Board, speaking through Presiding Commissioner Angele, found that Petitioner would not pose an unreasonable risk of danger to society or a threat to public safety if released, and he was suitable for parole. (Petition, Ex. A at 65–67.) The Board stated that, while in prison, Petitioner had "enhanced his ability to function within the law upon release through participation [in] education programs, self-help and therapy, vocational programs, and his job assignments and volunteer work." (*Id.*) He had completed a vocational shoe repair course, had been involved with Alcoholics Anonymous and Narcotics Anonymous, had been executive counsel for the Yoke Fellows, had participated in the Alternatives to Violence and Disciple Fellowship Group, had volunteered in the Protestant council and the prison literacy

program, and had received commendations for his exceptional work ethic. (*Id.*) The Board found that Petitioner had reduced his probability of recidivism because of "maturation, growth, greater understanding, and advanced age." (*Id.* at 66.)

The Board further found that Petitioner had realistic parole plans, including two job offers, family support, and a residence, and had maintained close family ties while in prison. (Petition, Ex. A at 66.) Although he had received 11 "115" disciplinary reports and six "128(a) counseling "chronos," his last "115" was in 1987, and his last "128 (a)" in 1991. (*Id.*) The Board found that Petitioner shows signs of remorse, understands the nature and magnitude of his offense, accepts responsibility for his criminal behavior, and has a desire to change. (*Id.*) The Board characterized Petitioner's 2002 psychological report, which rated him as a moderate threat, as "inconclusive," explaining that the panel had discussed it thoroughly and concluded that, because of the factors on which the assessment was based, it could never change. (*Id.* at 66–67.) The Board noted that the psychologist admitted to using the "least reliable instrument" for predicting future violence, and expressed surprise at why he did not elect to use "the most reliable instruments." (*Id.* at 67.)

The Board then computed Petitioner's parole date and set forth his parole conditions. (Petition, Ex. A at 67–68.) The Board computed Petitioner's term as 264 months, with a credit of 72 months, arriving at a total period of confinement of 192 months. (*Id.* at 68.)

The Board also noted that this was Petitioner's fourth, and possibly fifth, parole grant. (Petition, Ex. A at 68–69.)

### D. *The Governor's Decision*

Governor Schwarzenegger reviewed the Board's decision, pursuant to his authority under California Penal Code § 3041.2 and

the California Constitution, Article V, Section 8(b), and reversed the Board's grant of a parole date. (Petition, Ex. B.) After summarizing Petitioner's commitment offense as discussed above, the Governor summarized Petitioner's criminal history and his "deplorable prison conduct" during the early years of his incarceration.[7] (Petition, Ex. B at 2.) The Governor acknowledged that, since that time, Petitioner had "matured and made many positive changes in his life." (*Id.* at 2.) The Governor summarized these as follows:

> Mr. Murr has been completely disciplinary-free for the last 12 years. He obtained his GED—on his own—and also completed vocational shoe repair. Mr. Murr took correspondence courses in Bible studies and enrolled in additional courses as well. He has participated in and completed numerous self-help and therapy programs. His institutional work history shows that he was in charge of the mini-canteen for more than six years and received excellent work reports. He now works in special purchasing and has received above average to excellent reports. Since his last parole hearing in 2001, he has remained very involved in the 12–step program, completed two Alternatives to Violence workshops, and serves as an active member in the Protest[ant] Chapel. Additionally, he has received several laudatory reports praising his professionalism, respect toward staff and other inmates, leadership, work ethic, eagerness to learn, and honesty. Mr. Murr also teaches Bible classes and volunteers for the literacy program.

(Petition, Ex. B at 2.)

The Governor stated that Petitioner's "recent accomplishments are very encouraging" and that he now expresses remorse over Johnson's death. (Petitioner, Ex. B at 2.) Nevertheless, the Governor concluded that he was "unconvinced that [Petitioner]'s gains are sufficiently established to assure that his success within an institutional setting will transfer to life outside of prison." (*Id.*) The Governor then stated:

> Mr. Murr states that he takes responsibility for the murder. But at the 2003 hearing, he said that he was not present when Mr. Sequeira was shown Mr. Johnson's bloodied, dead body—and that he was not aware that Mr. Johnson had been killed. And he has consistently maintained that he was not the one who stabbed Mr. Johnson. Mr. Murr misses the point. I note also the probation officer's report that suggests Mr. Murr was the one who turned over Mr. Johnson's body so Mr. Sequeira could see the damage. And as recently as 2001, Mr. Murr claimed that he did not learn of Mr. Johnson's death until he was arrested.

(Petition, Ex. B at 3.)

The Governor commended Petitioner for his reasonable parole plans and "tremen-

[7]. The Governor wrote:

> Mr. Murr was no stranger to the criminal justice system when he was convicted of this crime. As a juvenile, he committed burglary, auto tampering, and curfew violations, and spent time in the California Youth Authority. And his criminal conduct escalated thereafter. His adult criminal history includes robbery, assault with a deadly weapon, receiving stolen property, and probation violations.
>
> Mr. Murr has been in prison for more than 26 years now. During the first seven years of incarceration, Mr. Murr was a drug user. He was also a drug dealer-selling for the Mexican Mafia and Aryan Brotherhood prison gangs. And in 1979, Mr. Murr was involved in a prison stabbing. Likewise, he received numerous prison-rules violations, including ones for physical altercations, possessing drug paraphernalia, making implied threats, setting fires, and disorderly conduct. In 1987, Mr. Murr tried to have another inmate take his GED examination for him.

(Petition, Ex. B at 2.)

dous support" from family and friends, but concluded that although Petitioner had "successfully acquired gains that favor parole," the Governor could not overlook "those that do not," or "the heinous, calculated crime he committed." (Petition, Ex. B at 3.) The Governor stated:

> [Petitioner] stormed into a man's home—which he had planned long in advance—blindfolded the babysitter, bound her with wire, and then—regardless of which version you believe—Mr. Johnson was stabbed twice, killing him. And that was not the end of it. When Mr. Sequeira came home—with his three children—they were met at the door by Mr. Murr, who ordered them to lie on the floor while he held them at gunpoint. Mr. Sequeira was then forced to look at Mr. Johnson's bloody, dead body. The motive for the crime—drugs and money—was very trivial. And forcing Mr. Sequeira to view the body of murdered Mr. Johnson—as if it were some sort of trophy—demonstrated a sick and exceptionally callous disregard for human suffering and life. I note that the San Bernardino County District Attorney's Office cited the same reasons when opposing parole for Mr. Murr at the 2003 hearing.

(Petition, Ex. B at 3.)

The Governor concluded that Petitioner continues to pose a risk of danger to society, and reversed the Board's decision. (Petition, Ex. B at 3.)

### E. *The Superior Court's Decision*

The Superior Court rejected Petitioner's habeas challenge to the Governor's reversal of the Board's decision. (Petition, Ex. H.) The Superior Court found that Petitioner had not presented evidence substantiating his claim that the Governor had not made an individualized determination but had merely signed a decision prepared by Board personnel. (*Id.* at 1–2.) It rejected

Petitioner's contention that, under the Ninth Circuit's opinion in *Biggs v. Terhune,* 334 F.3d 910 (9th Cir.2003), the nature of Petitioner's offense was not a ground for continually denying parole, stating that *Biggs* did not set forth a clear statement of constitutional law and the state court was not required to follow it. (*Id.* at 2.)

The Superior Court rejected Petitioner's contention that the Governor had not determined that Petitioner's crime was particularly egregious. It stated:

> Plainly the circumstances and the commission of the crime and the showing of complete lack of human compassion for the innocent woman and small children that were found to be victims and observers of the crime scene and [P]etitioner's participation meets the criteria of 'particularly egregious' conduct.

(Petition, Ex. H at 2.)

The Superior Court also rejected Petitioner's description of the crime as "unintentional felony murder." (Petition, Ex. H at 3.) The state court concluded that "[a] reading of the facts surrounding the conduct of the [P]etitioner as described by the Board and the Governor's decision demonstrates a crime far from an 'unintentional killing.' " (*Id.*)

Further, the Superior Court rejected Petitioner's arguments that: "the Governor's decision of reversal requires more than a mere finding of some evidence that the crime was grave, callous or violent"; and the Court "should review the evidence on its own and find and determine that there is a lack of evidence that he was unsuitable for parole." (Petition, Ex. H at 3.) The Superior Court stressed the Governor's discretion and the deferential nature of the "some evidence" review. (*Id.*) Without expressly identifying the evidence it found to constitute "some evidence" supporting the Governor's decision, the Supe-

rior Court described the Governor's decision as follows:

> The decision of the [Governor] extensively discussed the atrocious events that constituted the crime which involved 18 terrorizing a Mrs. Whitning [*sic*] and three small children as well as a callous senseless killing of a human being by stabbing him in his bed. The Governor in his decision also spoke extensively about the [P]etitioner's criminal history and his initial deplorable prison conduct which the Governor spoke of as "troubling." The decision also spoke concerning the [P]etitioner's recent favorable change and lifestyle while in prison and the support he was receiving from family members outside the institution, including parole plans for employment and support.

(Petition, Ex. H at 3.)

The Superior Court discussed the "some evidence" standard and stated that the gravity of the offense may be a basis for denial of parole, but the Governor must also consider other factors relevant to suitability. (Petition, Ex. H at 3–4.) The Superior Court found that the Governor had considered the positive factors in his decision and was not required to set forth "the precise manner in which specific facts were relevant to parole suitability." (Petition, Ex. H at 4.)

The Superior Court noted that it had previously granted habeas relief to Petitioner in connection with the Governor's reversal of an earlier parole grant by the Board and had remanded the matter back to the Governor to consider all factors required by law or to set aside his reversal. (Petition, Ex. H. at 1, 4.) "However, based upon the perfunctory manner in which this defect was cured in the last proceedings, the court sees little value in

going through that procedure again." [8] (*Id.*).

Thus, the Superior Court denied habeas relief. (Petition, Ex. H at 4.)

## PETITIONER'S CLAIMS

1. The Governor's reversal of the Board's decision violated Petitioner's right to due process, because the Governor did not personally review Petitioner's record but merely signed a decision prepared for him by Board staff.

2. The Governor's reliance on Petitioner's commitment offense and prior record to deny him parole violates due process.

3. The Governor was not entitled to rely on Petitioner's commitment offense to deny parole, because Petitioner's criminal conduct was not particularly egregious compared to other first degree murders and the Governor did not find that it was.

4. Petitioner did not receive individualized consideration of his suitability for parole, because the Governor finds all first degree murderers unsuitable for parole based on their commitment offenses.

5. There is no evidence supporting the Governor's determination that Petitioner is unsuitable for parole.

6. The Board's 1995 rescission of Petitioner's 1991 parole grant violated due process.

(Petition at 15–23.)

## STANDARD OF REVIEW

■ The Petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under Section 2254(d), a federal court may not grant a writ of habeas corpus on behalf of a person in

---

**8.** The Superior Court was referring to Governor Gray Davis's August 3, 2003 decision.

*See* Petition, Ex. O at 301–2.

state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *see also Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005). In this case, review of Petitioner's claims is governed by Section 2254(d)(1).[9]

■ "Clearly established Federal law," for purposes of Section 2254(d)(1) review, "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *see also Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006); *Lockyer v. Andrade,* 538 U.S. 63, 71, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Stokes v. Schriro,* 465 F.3d 397, 401–02 (9th Cir. 2006) (this statutory language "refers to Supreme Court precedent at the time of the last-reasoned state court decision"). Section 2254(d)(1) "plainly restricts the source of clearly established law to the Supreme Court's jurisprudence." *Lambert,* 393 F.3d at 974; *see also Plumlee v. Masto,* 512 F.3d 1204, 1210 (9th Cir.2008) (*en banc*) ("What matters are the holdings of the Supreme Court, not the holdings of lower federal courts."), *cert. denied,* —— U.S. ——, 128 S.Ct. 2885, 171 L.Ed.2d 822 (2008). However, although "[o]nly Su-

preme Court precedents are binding on state courts under AEDPA," Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." *Campbell v. Rice,* 408 F.3d 1166, 1170 (9th Cir.2005) (*en banc*).

■ Under the first prong of Section 2254(d)(1), a state court decision is "contrary to" federal law if the state court applies a rule that contradicts the governing law as stated by the Supreme Court or reaches a different conclusion than that reached by the high court on materially indistinguishable facts. *Price v. Vincent,* 538 U.S. 634, 640, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003). This includes "use of the wrong legal rule or framework." *Frantz v. Hazey,* 533 F.3d 724, 734 (9th Cir.2008) (*en banc.*)

■ The second prong of Section 2254(d)(1) is met when a state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies it to the facts of the petitioner's case. *Williams,* 529 U.S. at 412–13, 120 S.Ct. at 1523. The "unreasonable application" inquiry is an objective one, and the standard is not satisfied simply by showing error or incorrect application of the governing federal law. *Andrade,* 538 U.S. at 75, 123 S.Ct. at 1174; *Woodford v. Visciotti,* 537 U.S. 19, 25, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (*per curiam*); *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550

---

**9.** *See Lambert v. Blodgett,* 393 F.3d 943, 966–69 (9th Cir.2004) (Section 2254(d) applies when the state court has denied a claim based on its substance, rather than on the basis of a procedural or other rule precluding state

court review of the merits). Petitioner has not raised any Section 2254(d)(2) challenge to the state court's rejection of his claims, and the record does not reveal any basis for such a challenge.

U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007).

■ Petitioner presented the claims alleged as Grounds One through Five in this action to the state courts by habeas petitions.[10] (Answer, Exs. 6, 8, 10.) The San Bernardino County Superior Court denied his claims in a reasoned decision, and the California Court of Appeal and the California Supreme Court denied them summarily. (Petition, Exs. H, I, J.) The state high court's "silent" denial is considered to be "on the merits" and to rest on the last reasoned decision on these claims, namely, the grounds articulated by the San Bernardino County Superior Court in its decision. *See Ylst v. Nunnemaker,* 501 U.S. 797, 803–06, 111 S.Ct. 2590, 2594–96, 115 L.Ed.2d 706 (1991); *Hunter v. Aispuro,* 982 F.2d 344, 347–48 (9th Cir.1992). This Court, therefore, will look to the San Bernardino County Superior Court's reasoned decision as a starting point for determining whether Petitioner's claims warrant federal habeas relief.

## DISCUSSION

### I. *PETITIONER IS ENTITLED TO FEDERAL HABEAS RELIEF UNDER GROUNDS TWO, THREE AND FIVE; GROUNDS ONE AND FOUR DO NOT WARRANT RELIEF.*

■ In Grounds One through Five, Petitioner contends that due process was violated by the Governor's January 23, 2004

reversal of the Board's August 27, 2003 decision finding him suitable for parole.[11] (Petition at 9–17.) For the reasons set forth below, the Court concludes that Petitioner is entitled to federal habeas relief under Grounds Two, Three, and Five, but he is not entitled to federal habeas relief under Grounds One and Four.

### A. *Federal Habeas Review Of The Governor's Decision*

■ "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979). However, a state may, if it chooses, create a statutory parole scheme that gives rise to a liberty interest protectible by the Due Process Clause. *Id.* at 11–12, 99 S.Ct. at 2106; *see also Board of Pardons v. Allen,* 482 U.S. 369, 373, 107 S.Ct. 2415, 2418, 96 L.Ed.2d 303 (1987).

The Ninth Circuit has held that, under the clearly established framework of *Greenholtz* and *Allen,* "California's parole scheme gives rise to a cognizable interest in release on parole." *McQuillion v. Duncan,* 306 F.3d 895, 902 (9th Cir.2002); *see also Irons v. Carey,* 505 F.3d 846, 850 (9th Cir.2007) ("California Penal Code section 3041 vests Irons and all other California prisoners whose sentences provide for the

10. Grounds One through Five challenge the Governor's 2004 decision reversing the Board's 2003 parole grant. Ground Six, instead, challenges the Board's 1995 rescission of its 1991 grant of parole. As discussed *infra,* the Court has concluded that Ground Six is untimely. Accordingly, the Court does not address the merits of Ground Six pursuant to the above-described Section 2254(d)(1) standard of review.

11. To the extent Petitioner contends that the Governor's decision violated his rights under

the California Constitution, or under state statutory, regulatory, or decisional law, his claims are not cognizable in this action. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (reiterating that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Langford v. Day,* 110 F.3d 1380, 1389 (9th Cir.1996) ("alleged errors in the application of state law are not cognizable in federal habeas corpus").

possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."); *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir.2006) ("Because we hold that Sass has a constitutionally protected liberty interest in a parole date, we proceed to examine whether the deprivation of this interest, in this case, violated due process.").

 Nevertheless, the Due Process Clause does not require an inmate facing a determination of his suitability for parole to be afforded the full panoply of rights due to a defendant in a criminal prosecution. *Jancsek v. Oregon Board of Parole*, 833 F.2d 1389, 1390 (9th Cir.1987); *Pedro v. Oregon Parole Board*, 825 F.2d 1396, 1399 (9th Cir.1987). The inmate is entitled to notice of the suitability hearing and an opportunity to be heard. If parole is denied, he is also entitled to a statement of the reasons for the denial. *Greenholtz*, 442 U.S. at 14 n. 6, 16, 99 S.Ct. at 2107 n. 6, 2108.

 Due process also requires that there exist "some evidence" to support the parole decision. *Irons*, 505 F.3d at 851 ("the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process ... if the board's decision is not supported by 'some evidence in the record'"; *citation omitted*); *Sass*, 461 F.3d at 1128–29 (affirming that the "some evidence" standard set forth in *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), in the context of disciplinary hearings, constitutes clearly established law under Section 2254(d) in the parole context). In addition, the evidence underlying the parole decision must have "some indicia of reliability." *Jancsek*, 833 F.2d at 1390; *see also Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir.2005) ("If the Board's determination of parole suitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision.").

 "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. *Sass*, 461 F.3d at 1128 (*quoting Hill*, 472 U.S. at 455–56, 105 S.Ct. at 2774). Evidence that is "meager" or indirect may still be sufficient under the "some evidence standard." *Hill*, 472 U.S. at 457, 105 S.Ct. at 2775. Although the *Hill* "some evidence" standard is "minimal," it provides some assurance that "'the record is not so devoid of evidence that the findings of the [Board] were without support or otherwise arbitrary.'" *Sass*, 461 F.3d at 1129 (*quoting Hill*, 472 U.S. at 457, 105 S.Ct. at 2775).

 When a federal habeas court assesses whether the Board's or the Governor's parole suitability determination is supported by "some evidence," its analysis is framed by the statutes and regulations governing parole suitability. *Irons*, 505 F.3d at 851. The federal court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole," and then review the record to determine whether the state court's determination that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle articulated in *Hill. Id.*

**B. *California Law Regarding Parole Suitability***

California's parole scheme contemplates that a prisoner sentenced to a term of life with the possibility of parole must be

found suitable for parole before a parole date can be set. California Penal Code § 3041, subsection (a), provides that a panel of the Board shall meet with an inmate one year before his minimum eligible parole date "and shall normally set a parole release date." California Penal Code § 3041(b) provides that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration," and a parole date cannot as yet be fixed.

The implementing regulations set forth additional criteria for determining whether a prisoner is suitable for parole. The panel must consider "[a]ll relevant, reliable information." Cal.Code Regs. tit. 15, § 2281(b).[12] Such information includes the prisoner's social and criminal history, his or her mental state, and his or her commitment offense and attitude towards the offense. *Id.* Circumstances indicating unsuitability include: the commitment offense; a previous record of violence; unstable social history; sadistic sexual offenses; psychological factors; and misconduct in prison. Cal.Code Regs. tit. 15, § 2281(c). The regulations specifically identify five factors to be considered in determining whether the inmate committed the offense in an "especially heinous, atrocious or cruel manner" indicating unsuitability for parole. *Id.* These factors include: (1) multiple victims were attacked, injured, or killed in the same or separate incidents; (2) the offense was carried out in a dispassionate and calculated manner, such as an execu-

tion-style murder; (3) the victim was abused, defiled, or mutilated during or after the offense; (4) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; and (5) the motive for the crime is inexplicable or very trivial in relation to the offense. *Id.*

Circumstances indicating suitability include: no juvenile record; a stable social history; signs of remorse; motivation for the crime; lack of criminal history; the prisoner's age and plans for the future; and the prisoner's conduct in prison. Cal. Code Regs. tit. 15, § 2281(d). Nevertheless, the prisoner must be found unsuitable and denied a parole date if, in the judgment of the panel, he or she will pose an unreasonable danger to society if released. Cal.Code Regs. tit. 15, § 2281(a).

 Final authority over the parole of convicted murderers rests with the Governor. The California Constitution provides that the decision of the Board concerning the parole of a convicted murderer shall not be final for 30 days, during which time the Governor "may review the decision subject to procedures provided by statute." Cal. Const. Art. 5, § 8(b); *see also* California Penal Code § 3041.2. "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." Cal. Const. Art. 5, § 8(b). Thus, the Governor does not have unfettered discretion over parole matters, but must make his parole decisions based on the same factors that the Board is required to consider. *In re Rosenkrantz*, 29 Cal.4th 616, 625–26, 128 Cal.Rptr.2d 104, 115, 59 P.3d 174

---

12. Parole suitability criteria applicable to prisoners who, like Petitioner, were convicted of committing murder before November 8, 1978, are set forth in Cal.Code Regs. tit. 15, § 2281. Parole suitability criteria applicable to prisoners convicted of committing murder after November 8, 1978 are set forth in Cal. Code Regs. tit. 15, § 2402. They are, however, identical. *Board of Prison Terms v. Superior Court*, 130 Cal.App.4th 1212, 1232 n. 5, 31 Cal.Rptr.3d 70, 83 n. 5 (2005).

(2002). The Governor need not accept the Board's findings; the statutory scheme contemplates that he will "undertake an independent, de novo review of the prisoner's suitability for parole." *Id.* at 660, 128 Cal.Rptr.2d at 143, 59 P.3d 174. When the Governor decides to reverse the Board's parole decision, he must provide a written decision specifying his reasons. California Penal Code § 3041.2(b).

■■■■ "[T]he paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety and thus may not be released on parole." *In re Lawrence*, 44 Cal.4th 1181, 1210, 82 Cal.Rptr.3d 169, 189, 190 P.3d 535 (2008). In *Lawrence*, the California Supreme Court expressly rejected the notion that the mere existence of one or more unsuitability factors described in the parole regulations is necessarily sufficient to support the ultimate conclusion that the inmate poses an unreasonable risk of danger to the public if released. The state high court explained: "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." *Id.* at 1212, 82 Cal. Rptr.3d at 190, 190 P.3d 535. Thus, consideration of the specified factors "requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." *Id.* at 1210, 82 Cal.Rptr.3d at 189, 190 P.3d 535. "[B]ecause the core statutory determination entrusted to the Board and the Governor is whether the inmate poses a current threat to public safety, the standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." *Id.* at 1191, 82 Cal.Rptr.3d at 173, 190 P.3d 535; *see also In re Shaputis*, 44 Cal.4th 1241, 1254–55, 82 Cal.Rptr.3d 213, 223–24, 190 P.3d 573 (2008) (companion case to *Lawrence*).

■■■■ As noted above, the Ninth Circuit's decision in *Irons* expressly instructs that the application of the "some evidence" standard is framed by California parole statutes and regulations. *Irons*, 505 F.3d at 851 (the court must first "look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole" and then apply the "some evidence" standard to those findings). In *Lawrence*, the California Supreme Court clarified what findings are necessary to deem a prisoner unsuitable for parole under California's statutes and regulations. This Court is bound by the California Supreme Court's construction of California law. *See Estelle*, 502 U.S. at 67–68, 112 S.Ct. at 480; *see also Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) (*per curiam*). Given the Ninth Circuit's directive in *Irons* and the California Supreme Court's clarification that the mere existence of an unsuitability factor does not necessarily support the conclusion that an inmate is currently dangerous, the Court concludes that, in order for the *Hill* "some evidence" standard to be satisfied, the factors identified by the Board or the Governor as reasons for finding an inmate unsuitable for parole must support the ultimate conclusion that the inmate's release poses an unreasonable risk of danger to public safety.[13]

---

13. Many district courts have reached the same conclusion. *See, e.g., Milot v. Haws*, 628 F.Supp.2d 1152, 1168–72 (C.D.Cal.2009) (citing the *Irons* directive to look to California law and reviewing for evidence of current dangerousness; granting habeas relief); *Olivas v. Muntz*, 2009 WL 2848670, *5–*11

**C. Grounds Two, Three, And Five: The Superior Court's Determination That The Governor's Decision Was Supported By "Some Evidence" Was Objectively Unreasonable.**

In Grounds Two, Three, and Five, Petitioner challenges the Governor's conclusion that he is not suitable for parole. In Ground Two, Petitioner contends that the Governor's reliance on Petitioner's commitment offense and prior record to deny him parole violates due process. (Petition at 11–12.) In Ground Three, Petitioner contends that his offense was not sufficiently egregious to serve as a basis for denial of parole, and that the Governor did not find that it was. (*Id.* at 14–15.) In Ground Five, Petitioner contends that the Governor's decision is unsupported by any evidence under the "some evidence" test. (Petition at 12–14, 16–17.)

As discussed above, the San Bernardino County Superior Court rejected each of these claims in a reasoned decision. (Petition, Ex. H.) After carefully reviewing the record, the Court concludes that the Superior Court unreasonably applied the *Hill* standard when it found that the Gover-

nor's reversal of the Board's grant of parole passed muster under the "some evidence" test.

As noted above, the Governor based his reversal of the Board's decision on the nature of Petitioner's conviction offense, his criminal history, and his substance abuse and other misconduct during his early years in prison. (Petition, Ex. B at 2–3.) The Governor also implied that Petitioner's acceptance of responsibility for the crime is suspect, because Petitioner's description of the crime diverges in some respects from the probation officer's description of the crime in the Probation Report. (*Id.* at 2.) The Superior Court implicitly found that the circumstances of Petitioner's conviction offense, his criminal history, and his "initial deplorable prison conduct" constituted "some evidence" supporting the Governor's decision. (Petition, Ex. H at 2, 3.) The Court will address each of these factors, albeit in a different order.

**1. Petitioner's Record Before And After Incarceration**

 The Governor stated that he was "troubled" by Petitioner's extensive criminal history, disciplinary record in prison, and extensive substance abuse at the time

(C.D.Cal., Aug. 31, 2009) (citing the *Irons* directive to look to California law and reviewing for evidence of current dangerousness; denying habeas relief); *Hoffman v. Marshall,* 2009 WL 585437, *9–*15 (C.D.Cal., March 5, 2009) (citing the *Irons* directive to look to California law and reviewing for evidence of current dangerousness; granting habeas relief); *Ochoa v. Mendoza–Powers,* 2009 WL 1034494, *3–*4 (E.D.Cal., April 16, 2009) (citing the *Irons* directive to look to California law and reviewing for evidence of current dangerousness; denying habeas relief); *Styre v. Adams,* 635 F.Supp.2d 1166, 1168–70 (E.D.Cal.2009) (citing the *Irons* directive to look to California law and reviewing for evidence of current dangerousness; granting habeas relief); *Tripp v. Cate,* 2009 WL 248368, *6, *10–*12 (N.D.Cal., February 2, 2009) (reviewing for evidence of current dangerousness; granting

habeas relief); *Ortega v. Dexter,* 2008 WL 5263833, *6 (C.D.Cal., December 16, 2008) (describing some evidence standard as "not whether the evidence supported any particular factor regarding parole suitability, but rather whether 'some evidence' indicates the prisoner's release unreasonably would endanger public safety"; denying habeas relief); *Tash v. Curry,* 2008 WL 3984597, *4, *11–*12 (N.D.Cal., Aug. 28, 2008) (reviewing for evidence of current dangerousness; granting habeas relief); *but see Gzikowski v. Dexter,* 2009 WL 1530817, *7 (C.D.Cal., May 9, 2009) (refusing to apply *Lawrence* standard; noting that the California Supreme Court issued *Lawrence* after state court's decision and did not indicate it should apply retroactively; and rejecting report and recommendation recommending grant of habeas relief).

of the crime and for many years thereafter. (Petition, Ex. B at 2.) The Governor correctly characterized Petitioner's pre-conviction criminal conduct as escalating and his disciplinary conduct during his early years in prison as "deplorable." (*Id.; see* Petition, Ex. A at 14–16, 32, 36.) Moreover, Petitioner freely admitted at his hearing that, but for his drug abuse, he would not have committed his crime. (Petition, Ex. A at 35.)

Nevertheless, at the time of the Governor's 2004 reversal of the Board's decision, more than 26 years had passed since Petitioner's pre-conviction criminal acts, and he had been discipline-free for 13 years (17 years if one disregards his 1991 "counseling chrono" for contraband) and drug-free, with one lapse 16 years earlier, for almost 20 years.[14] (*See* Petition, Ex. B at 32, 37.) There was evidence of Petitioner's extensive participation in Alcoholics Anonymous, Narcotics Anonymous and other self-help and therapy programs, his continued involvement in the 12–step recovery program, and his work helping other inmates battling drug addiction. (Petition, Ex. A at 28–30, 35–36.) The Governor recognized that Petitioner had "matured and made many positive changes in his life." (Petition, Ex. B at 2.) The Governor also acknowledged that prison officials praised Petitioner's "professionalism, respect towards staff and other inmates, leadership, work ethic, eagerness to learn, and honesty." (*Id.*)

Although the Governor stated he was "unconvinced that [Petitioner]'s gains are sufficiently established to assure that his success within an institutional setting will transfer to life outside of prison," the Governor did not find that Petitioner required further therapy or rehabilitative programming. (Petition, Ex. B at 2, 3.) Critically, the Governor did not reason that Petitioner posed a *current* risk of danger due to his past substance abuse or disciplinary violations. *See Lawrence,* 44 Cal.4th at 1212, 82 Cal.Rptr.3d at 190, 190 P.3d 535. The Superior Court mentioned the Governor's discussion of Petitioner's criminal history and "deplorable" early prison record, but also failed to make any express findings about how these factors show Petitioner's current dangerousness. (*See* Petition, Ex. H.)

Thus, neither the Governor nor the Superior Court articulated a nexus between Petitioner's past criminal and disciplinary record and substance use, on the one hand, and the Governor's conclusions regarding his current dangerousness, on the other. *See Lawrence,* 44 Cal.4th at 1212, 82 Cal. Rptr.3d at 190, 190 P.3d 535. The Court finds that, given the passage of time and Petitioner's exemplary conduct in recent years, Petitioner's criminal and disciplinary history and his past substance abuse do not constitute "some evidence" that he remains a threat to public safety, and do not support the Governor's finding that he is unsuitable for parole. *See Styre,* 635 F.Supp.2d at 1170 ("Because Styre's past substance abuse does not indicate that he currently poses a threat to public safety, it is insufficient to support the Governor's reversal of the Board's determination that Styre is suitable for parole.").

### 2. *Commitment Offense And Acceptance Of Responsibility*

 Under California law, the nature of a prisoner's commitment offense may alone constitute a sufficient basis for finding a prisoner unsuitable for parole.[15]

---

**14.** Petitioner received his last disciplinary violation in 1987. (Petition, Ex. A at 32.)

**15.** The Ninth Circuit has observed that continued reliance on unchanging factors such as the nature of the commitment offense and the

prisoner's pre-incarceration conduct to deny parole might eventually constitute a violation of due process. *Biggs v. Terhune,* 334 F.3d 910, 916 (9th Cir.2003). However, this observation was *dictum. See Kunkler v. Muntz,* 226

*Lawrence,* 44 Cal.4th at 1212, 82 Cal. Rptr.3d at 190, 190 P.3d 535; *Rosenkrantz,* 29 Cal.4th at 682, 128 Cal.Rptr.2d at 161, 59 P.3d 174 ("The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole."). However, "under the [parole] statute and the governing regulations, the circumstances of the commitment offense ... establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." *Lawrence,* 44 Cal.4th at 1212, 82 Cal.Rptr.3d at 190, 190 P.3d 535. "[T]he Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety." *Id.* at 1221, 82 Cal.Rptr.3d at 198, 190 P.3d 535 (citing regulation).

 In a case where, as here, the inmate did not himself kill the victim, the Governor must focus on the inmate's role, rather than the role(s) played by his confederate(s), in determining whether the circumstances of the crime show that he remains currently dangerous. The California regulations require the Governor to consider whether ["t ]*he prisoner* committed the offense in an especially heinous, atrocious or cruel manner." Cal.Code Regs. tit 15, § 2281(c)(1) (emphasis added). Thus, although Petitioner is criminally responsible as a principal for Johnson's murder, it is his own acts, not those of the killer, that determine whether the nature of his offense shows his unsuitability for parole. "The state may hold a person criminally liable when his crime partner kills during a robbery, but the [Governor] has a different chore. The [Governor] is charged with determining whether a prisoner is suitable for parole, not whether he may be held liable for the killing in the first place." *Rio v. Board of Prison Terms,* 2006 WL 3783575, *5 (N.D.Cal. 2006).

 There is no evidence in the record that Petitioner killed Johnson, nor did the Governor find that he did so.[16] (*See* Petition, Ex. B at 1–3.) Petitioner stated at the hearing that he believed Matthews stabbed Johnson, because Matthews was the only one of the three men carrying a knife. (Petition, Ex. A at 10; *see* Lodg., Ex. 2.) Indeed, the transcript of Petitioner's 1991 parole hearing contains a reference by counsel to confidential information that Matthews confessed to the stabbing. (Petition, Ex. C at 8.)

 Petitioner contends that he was not even present at the murder. The Governor implicitly found that Petitioner was present, repeating the statement in the Probation Report that all three men went to Johnson's bedroom. (Petition, Ex. B at 1; Lodg., Ex. 2 at 2.) The record before the Court does not include the transcript of the trial or any judicial decision sum-

---

Fed.Appx. 669, 670–71 (9th Cir.2007) (referring to the *"Biggs dictum"*); *see also Medway v. Schwarzenegger,* 257 Fed.Appx. 44, 45 (9th Cir.2007) ("there is no clearly established Federal law ... that limits the number of times a parole board or the governor may deny parole based on the brutality of the commitment offense"); *Culverson v. Davison,* 237 Fed.Appx. 174, 175 (9th Cir.2007) (same).

**16.** Although the Governor's Decision contains statements such as "[Petitioner] has consistently maintained that he was not the one who stabbed Mr. Johnson," "[Petitioner] misses the point," and "regardless of which version you believe[,] Mr. Johnson was stabbed twice" (Petition, Ex. B at 2, 3), these statements do not equate to a finding that Petitioner stabbed Johnson, nor is there evidence in the record that supports such a finding.

marizing the evidence, and the Probation Report on which the Governor relied states that the description of the crime is taken from the police reports in the district attorney's file. (Lodg., Ex. 2.) At his suitability hearing, Petitioner explained that he did not go to the bedroom with his companions but, rather, remained with Whitley and began tying her up. (Petition, Ex. A at 50–51.) The Board apparently accepted Petitioner's explanation; Presiding Commissioner Angele remarked that it would not have made sense for Petitioner and his cohorts to leave Whitley alone without anyone to guard her. (*Id.*) The Governor was entitled to take a different view than the Board. *See Rosenkrantz,* 29 Cal.4th at 677, 128 Cal.Rptr.2d at 156, 59 P.3d 174 ("Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor."). Even so, in the absence of evidence that Petitioner killed Johnson or in some manner actually participated in the killing, the brutal manner in which Johnson was killed cannot, without more, constitute "some evidence" of Petitioner's current dangerousness. *See Rio,* 2006 WL 3783575 at *5 (although Rio was present when his accomplice shot the victim, the unexpected execution-style killing did not provide evidence of Rio's unsuitability for parole).

The Governor cited the following additional acts as demonstrating Petitioner's unsuitability for parole: (1) "storming" into a man's home, as planned long in advance; (2) blindfolding the babysitter and binding her with wire; (3) holding Sequeira and his children at gunpoint; and (4) forcing Sequeira to view Johnson's dead body. (Petition, Ex. 2 at 3.) The Governor also found that the motive for the crime—drugs and money—was very trivial. (*Id.*)

Because there is no evidence that Petitioner intended to commit any crime other than robbery, or that he was an active participant in Johnson's killing, Petitioner's actions in carrying out the robbery—entering Sequeira's house, blindfolding and binding Whitley, and holding Sequeira and his children at gunpoint with a gun he found in the house—do not constitute evidence that he "committed the [murder] in an especially heinous, atrocious, or cruel manner." Cal.Code Regs. tit 15, § 2281(c)(1). *See Rio,* 2006 WL 3783575 at *5 (the circumstances of murder committed during robbery did not constitute "some evidence" of inmate's unsuitability when, although the inmate was present when his crime partner shot the victim, the shooting was "rather unexpected" to him, he was not the leader of the criminal episode, and he did not direct the killing or urge the killer to kill); *contrast Biggs,* 334 F.3d at 912 (although Biggs did not kill the victim himself, his participation in the crime constituted "some evidence" supporting parole denial when he was involved in the murder ruse, was present during the murder, paid money to the co-conspirators, and returned with the killer to help conceal the body).

Similarly, the Governor's finding regarding Petitioner's motive for the crime pertains to his motive for the *robbery.* (*See* Petition, Ex. B at 3.) Petitioner testified that he did not know why Johnson was stabbed. (Petition, Ex. A at 10.) While the killer's motive for stabbing Johnson may well have been trivial, the killer's motive cannot be attributed to Petitioner as evidence of his unsuitability for parole. *See Rio,* 2006 WL 3783575 at *6 ("[D]ue to the absence of evidence that Rio led the criminal episode, directed the killing or otherwise urged the killer to kill, the idea of another person's motive being attributed to Rio defies common sense. Whatever motivated his crime partner to kill the victim does not provide some evidence that

Rio 'committed the offense in an especially heinous, atrocious or cruel manner.' ").

This leaves the act of showing Johnson's dead body to Sequeira, as described in the Probation Report. (Lodg., Ex. 2 at 3.) According to the Probation Report, Petitioner rolled Johnson's dead body over to show Sequeira the stab wounds. (*Id.*) Petitioner denies doing this and maintains that he did not even know of the stabbing until after the robbery. (Petition, Ex. A at 44.) At the parole hearing, he explained that he did not accompany his two accomplices and Sequeira to the bedroom, because he was guarding Whitley and the children in another room. (Petition, Ex. A at 11, 13, 44.) The Board apparently believed him.[17] (*See* Petition, Ex. A at 11–13.) There is nothing before the Court to show what, if any, evidence was presented regarding this point at trial; the evidence before the Court consists only of the statement by the probation officer in the Probation Report, based on information taken from police reports in the district attorney's file, and the version given by Petitioner at his hearing.

■ The Governor, of course, is entitled to resolve any conflicts in the evidence. *See Rosenkrantz*, 29 Cal.4th at 677, 128 Cal.Rptr.2d at 156, 59 P.3d 174. However, the Governor never actually resolved the conflict. The Governor merely stated, without specifying the person responsible, that "Mr. Sequeira was taken into the bedroom and shown Mr. Johnson's body and stab wounds," and "Mr. Sequeira was then forced to look at Mr. Johnson's bloody, dead body." (Petition, Ex. B at 1, 3.) Elsewhere, the Governor declared that Petitioner's contention that he was not present when Sequeira was shown the body demonstrates that he does not fully accept responsibility and also noted "the probation officer's report that *suggests* [Petitioner] was the one who turned over Mr. Johnson's body so Mr. Sequeira could see the damage." (Petition, Ex. B at 2; emphasis added.) This, however, does not constitute a finding by the Governor that Petitioner did, in fact, show Sequeira the body.

■ The Governor found that forcing Sequeira to view Johnson's dead body, "as if it were some sort of trophy," demonstrated a sick and exceptionally callous disregard for human life.[18] (Petition, Ex. B at 3.) The Court shares the Governor's revulsion at this repugnant act. However, if Petitioner was not the man who forced Sequeira to view Johnson's body—and the Governor does not expressly find that he was—the action has no bearing on his suitability for parole. *See Northrop v.*

17. The Board never asked Petitioner whether he showed Sequeira Johnson's body. The issue was addressed in the following exchange:

Presiding Commissioner Angele: Okay. And then when Mr. Sequeira came back, he was led into the bedroom and shown the body. Apparently, I guess to instill in his mind that they were serious, or somebody was serious there.

Inmate Murr: That's what I understand from the Probation Report. I don't even recall that being even said at my trial.

(Petition, Ex. B at 13.)

18. The Governor noted that the District Attorney expressed the same view at Petitioner's hearing. (Petition, Ex. B at 3.) However, the Governor did not identify the District Attorney's opposition to parole as a reason supporting his reversal of the Board's grant of parole. *See In re DeLuna*, 126 Cal.App.4th 585, 593–94, 24 Cal.Rptr.3d 643, 650 (2005) (review of parole decision does not include factors on which the parole authority could have relied, but did not); *see also Rosenkrantz v. Marshall*, 444 F.Supp.2d 1063, 1080 n. 14 (C.D.Cal.2006) (stating that the Board "simply noted the opposition" of the district attorney and sheriff's department to petitioner's parole, but "did not purport to deny parole on this ground," and the Superior Court did not decide that the opposition of these agencies constituted "some evidence" of unsuitability).

*Ylst*, 2007 WL 2255219, *10 (N.D.Cal., Aug. 3, 2007) (abuse Petitioner's wife inflicted on the victim did not constitute evidence of Petitioner's unsuitability for parole).

 The Governor stated that, despite evidence of Petitioner's rehabilitation, he could not overlook the "heinous, calculated crime [Petitioner] committed." (Petition, Ex. B at 3.) There is no evidence in the record that the murder (as opposed to the robbery) was "calculated," and certainly none that it was "calculated" by Petitioner. Moreover, under California's parole scheme, the proper inquiry is "not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." *Lawrence*, 44 Cal.4th at 1221, 82 Cal. Rptr.3d at 198, 190 P.3d 535 (emphasis in original).

Apart from conflating Petitioner's own acts with the acts for which he was criminally responsible but did not himself commit, the Governor failed to explain how the commitment offense remains probative of Petitioner's current dangerousness. The Superior Court similarly failed to articulate a nexus between Petitioner's 1977 crime and his current dangerousness. Since there is no evidence that Petitioner personally committed a "callous senseless killing of a human being by stabbing him in his bed," this heinous crime does not, by itself, indicate that Petitioner remains a danger 30 years later. (Petition, Ex. H at 2.) The record also does not support the Superior Court's finding that Petitioner's participation in the crime was "particularly egregious" because of his "complete lack of human compassion for the innocent woman and small children that were found to be the victims and observers of the crime scene." (Petition, Ex. H at 2.) Without minimizing the terror that must have been felt by Whitley when Petitioner bound and gagged her, and by the children when Petitioner confronted them with a gun, there is no evidence that Petitioner harmed them. Petitioner's conduct vis-a-vis Whitley and the children during the robbery, while contemptible, does not constitute evidence that he poses an unreasonable danger to the public 30 years later.

The California Supreme Court has explained that "the aggravated nature of a crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." *Lawrence*, 44 Cal.4th at 1214, 82 Cal.Rptr.3d at 192, 190 P.3d 535.

Such was the case in *Shaputis*, the companion case to *Lawrence*. After a long history of extreme violence towards his first wife, his second wife, and his daughters, and a criminal record that included charges of raping one of his daughters while intoxicated, Shaputis was convicted of the murder of his second wife. *In re Shaputis*, 44 Cal.4th at 1246–48, 82 Cal. Rptr.3d at 216–18, 190 P.3d 573. While incarcerated, he married his third wife, a recovering alcoholic. *Id.* at 1247 n. 3, 82, 82 Cal.Rptr.3d 213, 190 P.3d 573 Rptr. 3d at 576 n. 3. The California Supreme Court found that, despite Shaputis's advanced age and exemplary prison record, "some evidence" supported the Governor's conclusion that he remained a threat to public safety, because he failed to take responsibility for the murder of his wife and had failed to gain insight into his previous vio-

lent behavior, including the brutal domestic violence inflicted on his family. *Id.* at 1246, 82 Cal.Rptr.3d at 216, 190 P.3d 573.

Here, the Governor acknowledged that Petitioner "does now express remorse over Mr. Johnson's death," although the Governor's subsequent comments implied that, because Petitioner's version of the events diverges in some respects from the description of the crime in the Probation Report, he does not fully accept responsibility for the murder. (Petition, Ex. B at 2.) However, there is nothing in the record showing that Petitioner's version is, in fact, incorrect, and the Board viewed it as in some respects more plausible that the description in the Probation Report. At his hearing, Petitioner unequivocally admitted that he is responsible for the killing that occurred in the course of the robbery carried out by him and his partners, and he expressed remorse for his actions. (Petition, Ex. A at 12–13, 44.) This is not a case in which, as in *Shaputis*, a prisoner's lack of insight into his crime constitutes evidence that he remains dangerous if released.

Accordingly, Petitioner's commitment offense and his attitude towards his offense do not constitute "some evidence" that he is currently dangerous.

### 3. *Conclusion*

Petitioner committed his commitment offense in 1977, more than 30 years ago. He has served over 30 years on a sentence of seven years to life, and he is well past his minimum term. Moreover, Petitioner was a heavy drug user when he committed the robbery that led to Johnson's murder. He has since overcome his drug addiction, and except for one lapse in 1988, he has been drug-free since 1983. He has not committed any serious disciplinary violations since 1987, and he has been completely disciplinary-free since 1991. For almost two decades, his conduct has been exemplary, and his accomplishments and volunteer activities have been impressive. In the Governor's phrase, he has "tremendous support" from his family and solid parole plans for residence and employment. (Petition, Ex. A at 22–27, 64, Ex. B at 3.) The Governor acknowledges that Petitioner has "successfully acquired gains that favor parole." (Petition, Ex. B at 3.) Finally, the Board has at least four times found Petitioner suitable for parole.[19]

Given the absence of evidence that Petitioner participated in the murder (as opposed to the robbery) of which he was convicted, his lengthy incarceration (well past his minimum term), the strong evidence of his rehabilitation during the last two decades, and the Board's repeated decisions finding him suitable for parole, the Court finds that neither the circumstances of Petitioner's crime nor his criminal and disciplinary record and substance abuse before and during the early years of his incarceration constitute "some evidence" that he currently poses a danger to the public if released. Because there is no reliable evidence supporting the Governor's conclusion that Petitioner is unsuitable for parole, his reversal of the Board's parole grant is arbitrary and violates due process. *See Hill,* 472 U.S. at 455, 105 S.Ct. at 2774. For the same reasons, the Court concludes that the San Bernardino County Superior Court unreasonably applied the *Hill* "some evidence" standard when it rejected Petitioner's collateral challenge to the Governor's decision.

 Accordingly, the San Bernardino Superior Court's conclusion—that the Governor's determination that Petitioner is unsuitable for parole did not violate due

---

**19.** Indeed, Petitioner was found suitable for parole as early as 1991, and the suitability finding was reaffirmed twice by other panels before another panel rescinded his parole date in 1995. (Lodg., Ex. 3.)

process—constitutes an unreasonable application of clearly established federal law. Petitioner, therefore, is entitled to federal habeas relief.[20] 28 U.S.C. § 2254(d)(1).

#### 4. *Remedy*

Having determined that Petitioner is entitled to habeas relief, the proper remedy must be addressed. There is no need for the Board to set Petitioner's term, because it did so at Petitioner's August 27, 2003 suitability hearing. The Board set Petitioner's term of confinement at 192 months, or 16 years. Given that Petitioner has already served over 30 years, he is past his release date and is entitled to release. *See Hoffman*, 2009 WL 585437, *1, *15 (granting habeas relief and ordering petitioner's release on parole, because he had already served more than the term set by the Board); *McCullough v. Kane*, 2007 WL 1593227, *9 (N.D.Cal.2007) (granting habeas relief and directing inmate's release, because he was already past the release date set by the Board); *Rosenkrantz*, 444 F.Supp.2d at 1087 (granting habeas relief and directing inmate's release, because his release date had twice been determined and both those dates had long passed).

Accordingly, a writ of habeas corpus should issue directing Petitioner's release, subject to parole conditions set by the Board at his August 27, 2003 hearing. Furthermore, Petitioner's incarceration since the date his parole release date became final should be credited to his period

of parole supervision. *See McQuillion v. Duncan*, 342 F.3d 1012, 1015 (9th Cir.2003) (appropriate habeas remedy was release without parole supervision when petitioner's parole supervision period would have lapsed but for constitutional violation).

#### D. *Grounds One And Four: Petitioner Has Not Shown That The Governor Failed To Conduct An Individualized Review Of His Parole Suitability.*

In Grounds One and Four, Petitioner argues that the Governor did not consider the factors pertinent to Petitioner's suitability in the manner required by the California Constitution and California Penal Code § 3041.2. (Petition at 9–11, 16–17.)

In Ground One, Petitioner argues that the Governor's decision violates due process, because the Governor did not personally consider Petitioner's parole suitability. Petitioner maintains that the Board staff prepares a decision for the Governor's signature, and the Governor never actually reviews the record. (Petition at 9–11.) Petitioner has submitted a declaration in which Gary M. Diamond, an attorney who represents inmates before the Board, declares that he believes, based on certain 2002 conversations with Board staff described in the declaration, that Governor Davis's decisions reversing the Board's grants of parole were prepared by the Board. (Petition, Ex. F [Declaration of

**20.** Petitioner is entitled to federal habeas relief under Ground Five, and under Grounds Two and Three to the extent they assert the same claim as Ground Five. The Court rejects Ground Two to the extent it is premised on the *Biggs dictum,* which, as previously discussed, does not constitute clearly established federal law. The Court rejects Ground Three to the extent it is premised on the California Supreme Court's statements, in *Rosenkrantz,* 29 Cal.4th at 683, 128 Cal.Rptr.2d at 161, 59

P.3d 174, and *In re Dannenberg,* 34 Cal.4th 1061, 1095 & n. 16, 23 Cal.Rptr.3d 417, 440 & n. 16, 104 P.3d 783 (2005), suggesting that a commitment offense must involve acts beyond the minimum elements of the offense to be sufficiently egregious to support a finding of parole unsuitability. In *Lawrence,* the California Supreme Court expressly rejected the "minimum elements" test as unworkable. *Lawrence,* 44 Cal.4th at 1215–21, 82 Cal. Rptr.3d at 192–98, 190 P.3d 535.

Gary M. Diamond, dated August 20, 2002].)

The San Bernardino County Superior Court rejected this claim, stating that, although such a procedure would violate the California Constitution, Petitioner had not produced any admissible evidence that the policy existed or that any such policy was followed in his case. (Petition, Ex. H at 2.) The Court agrees.

■ Under California law, the Governor's parole decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious." *Rosenkrantz*, 29 Cal.4th at 677, 128 Cal.Rptr.2d at 156, 59 P.3d 174. The Court has before it a decision signed by Governor Schwarzenegger, not Governor Davis, discussing the factors pertinent to Petitioner's suitability for parole. It is accompanied by a cover letter from the Governor's Legal Affairs Secretary, representing that the Governor made his decision "[a]fter considering the same factors considered by the Board." (*See* Petition, Ex. B.) There is nothing before the Court showing that, despite these representations, the Governor did *not* consider the factors pertinent to Petitioner's parole suitability but merely rubber-stamped a decision prepared by Board staff.

■ A "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *see McCarns v. Dexter*, 534 F.Supp.2d 1138, 1155 (C.D.Cal.2008) (rejecting inmate's due process claim that the Governor reversed Board's parole grant without personally reviewing inmate's records, because there was no evidence that the Governor failed to personally review records); *Staben v. Hernandez*, 2007 WL 2238657, *25 (S.D.Cal.2007) (same; but

also noting that the statute does not require the Governor "to personally draft his decisions; the fact that he personally signed the decision establishes that he personally reviewed the decision"); *In re Rozzo*, 172 Cal.App.4th 40, 64, 91 Cal.Rptr.3d 85, 104 (2009) (rejecting claim that the Governor violated due process by failing to personally review inmate's case, because the Governor signed a statement of reasons explaining the basis for his reversal and the inmate did not present any evidence that the Governor did not make the final decision). There is no basis for finding that the San Bernardino Superior Court's dismissal of this claim was objectively unreasonable.

■ In Ground Four, Petitioner contends that the Governor reverses *all* parole grants to first degree murderers on the ground that the commitment offense was "especially grave," and, thus, fails to afford individualized consideration to each case and essentially eliminates the "particularly egregious" threshold for determining when a commitment offense can justify denial of parole. (Petition at 14–15.) Again, the San Bernardino County Superior Court's rejection of this claim was not unreasonable. (*See* Petition, Ex. B at 2.) Whatever may have happened in connection with the Governor's handling of other parole suitability cases, Petitioner can obtain habeas relief only if the Governor's decision in *his* case was constitutionally deficient. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (standing to bring claim requires concrete particularized injury). This Court has already concluded that, in this case, the Governor's reversal of the Board's grant of parole was constitutionally deficient, and Petitioner is entitled to habeas relief. The Governor's decisions in other cases are irrelevant to this determination.

Accordingly, the state court's denial of these claims was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the United States Supreme Court. Grounds One and Four, therefore, do not warrant federal habeas relief. 28 U.S.C. § 2254(d)(1).

## II. *GROUND SIX IS UNTIMELY.*

In Ground Six, Petitioner challenges the Board's 1995 rescission of his 1991 parole grant. (Petition at 18–23.) Petitioner contends that the rescission violated due process under the principles set forth in *McQuillion,* 306 F.3d at 906–08, because the rescission was based only the rescission panel's disagreement with the findings and conclusion of the granting panel. (Petition at 20–23.) Respondent contends that Ground Six should be dismissed as untimely. (Answer at 8–12.)

### A. *The Governing Limitations Period*

■■■■ State prisoners seeking habeas relief under 28 U.S.C. § 2254 are subject to a one-year time limit. The "statutory purpose" of the limitations period is to "encourag[e] prompt filings in federal court in order to protect the federal system from being forced to hear stale claims." *Carey v. Saffold,* 536 U.S. 214, 226, 122 S.Ct. 2134, 2141, 153 L.Ed.2d 260 (2002); *see also Mayle v. Felix,* 545 U.S. 644, 662, 125 S.Ct. 2562, 2573, 162 L.Ed.2d 582 (2005) (Congress "adopted a tight time line" in 1996, to "advance the finality of criminal convictions"); *Welch v. Carey,* 350 F.3d 1079, 1083 (9th Cir.2003) (*en banc* ).

■■■■ The one-year limitations period is set forth in 28 U.S.C. § 2244(d)(1). This limitations period is subject to a statutory tolling provision, which suspends it for the time during which a "properly-filed" application for post-conviction or other collateral review is "pending" in state court. 28 U.S.C. § 2244(d)(2); *Patterson v. Stewart,* 251 F.3d 1243, 1247 (9th Cir.2001). Addi-

tionally, in certain "extraordinary circumstances" beyond a prisoner's control, equitable tolling may be available to toll the one-year limitations period. *See, e.g., Jorss v. Gomez,* 311 F.3d 1189, 1192 (9th Cir.2002) ("A petition can also be timely, even if filed after the one-year period has expired, when statutory or equitable tolling applies.").

### B. *The Accrual Of Petitioner's Limitations Period*

The Section 2244(d)(1) limitations period is triggered and begins to run from the latest of: (A) the date on which the underlying judgment became final through either the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which any impediment to the filing of a federal petition created by unconstitutional state action is removed; (C) the date on which a newly recognized and retroactively applicable constitutional right was first recognized by the United States Supreme Court; or (D) the date on which the factual predicate underlying a claim could have been discovered through the exercise of due diligence. *See* 28 U.S.C. § 2244(d)(1)(A)(D).

■■■■ In habeas cases in which the state prisoner challenges an administrative decision, such as the denial of parole, Section 2244(d)(1)(D) is the applicable provision; the date that triggers the running of the limitations period is the date on which the factual predicate of the claims could have been discovered. *Shelby v. Bartlett,* 391 F.3d 1061, 1066 (9th Cir.2004); *Redd v. McGrath,* 343 F.3d 1077, 1081–84 (9th Cir.2003). The "factual predicate" for a habeas challenge to a parole board decision is discovered, or becomes known, on the date the administrative decision becomes final, subject to the petitioner receiving proper notice of the final decision, and the limitations period commences run-

ning on the day after the petitioner receives such notice. *Shelby,* 391 F.3d at 1066; *Redd,* 343 F.3d at 1084; *see also Watson v. Woodford,* 247 Fed.Appx. 938, 939–40 (9th Cir.2007) (Section 2244(d)(1)(D) governs parole denial cases, and the statute of limitations commenced in the case before it on the day after the petitioner receive notice of the Board's decision denying his administrative appeal of a parole denial decision).

With respect to the 1995 rescission decision in issue, Petitioner alleges that he filed a "timely administrative appeal, which the Board denied." (Petition at 18.) However, Petitioner does not allege when he received notification of that denial, and the record does not contain any evidence of that date. Presumably, Petitioner does not dispute that he received such notice, given his admission that he sought habeas relief based on that denial in the trial court, in the California Court of Appeal (by petition denied on December 14, 1995), and in the California Supreme Court (by petition denied on June 11, 1997). (Petition at 18–19.)

The record, thus, does not establish the precise date on which Petitioner became aware of the "factual predicate" for Ground Six within the meaning of Section 2244(d)(1)(D). At a minimum, however, the Court must assume that this date occurred no later than in the early Fall of 1995 (and likely much earlier), given that Petitioner sought habeas relief in the trial court, then in the California Court of Appeal on September 14, 1995, and then in the California Supreme Court on January 6, 1997.[21]

Petitioner argues that, even though "the facts comprising the claim arose" in 1995 (Traverse at 7), his limitations period did not commence running at that time. Although Petitioner admittedly "actively litigated" the substance of Ground Six in his state habeas petitions filed in 1995 and 1997, he contends that the limitations period for this claim did not commence until years later, when the Ninth Circuit issued its decision in *McQuillion, supra,* on September 25, 2002. Petitioner reasons that his claim was not likely to succeed prior to *McQuillion,* and therefore, the legal basis for his claim, and its attendant limitations period, did not exist until September 2002. Alternatively, Petitioner contends that *McQuillion* constituted a "factual basis" for his claim that was not discoverable until the decision issued. (Traverse at 7–8; *see also* Petition at 18–19.)

Petitioner's arguments fail. His first contention appears to be an attempt to invoke Section 2244(d)(1)(C), which does provide for a delayed accrual of the limitations period to the date when the Supreme Court "newly recognizes" a federal constitutional right and orders that it is "retroactively applicable to cases on collateral review." *McQuillion,* however, was a Ninth Circuit decision, not a Supreme Court decision, and was not made retroactively applicable to collateral proceedings. Moreover, in *McQuillion,* the Ninth Circuit acknowledged that the right it enunciated was one "previously assumed" to exist under longstanding Ninth Circuit case law. 306 F.3d at 902. Hence, Petitioner's contention that the legal basis for Ground Six did not exist until the issuance of the *McQuillion* decision is not persuasive. Indeed, the fact that Petitioner sought habeas relief in the state courts in 1995 through 1997 for this claim, years before *McQuillion* was decided, belies his argument.

---

**21.** Respondent has submitted evidence establishing that Petitioner's California Court of Appeal petition denied on December 13, 1995, was filed on September 14, 1995, and his California Supreme Court petition denied on June 11, 1997, was filed on January 6, 1997. (Lodg., Exs. 12–13.)

Section 2244(d)(1)(c) plainly has no applicability to Ground Six.

 Petitioner's attempted Section 2244(d)(1)(D) argument also lacks merit. As noted above, the Ninth Circuit, in *Shelby* and *Redd*, made clear that the term "factual basis" for purposes of this statute means the date on which the prisoner receives notice of the final administrative decision in issue. Petitioner's attempt to label *McQuillion*, a legal decision, as a "factual basis" for Section 2244(d)(1)(D) purposes is misguided. An appellate court decision in another person's case, even if it changes or clarifies the law in the petitioner's favor, does not constitute a new "fact" for purposes of the commencement of the AEDPA limitations period. *See Shannon v. Newland*, 410 F.3d 1083, 1088–89 (9th Cir.2005) ("a state-court decision establishing an abstract proposition of law arguably helpful to the petitioner's claim does not constitute the 'factual predicate' for that claim" under Section 2244(d)(1)(D)); *see also E.J.R.E. v. United States*, 453 F.3d 1094, 1097–98 (8th Cir.2006) (similarly construing parallel limitations provision in 28 U.S.C. § 2255(6)(4)).

Under Ninth Circuit precedent, Section 2244(d)(1)(D) governs Petitioner's limitations period for Ground Six. Petitioner has not shown otherwise.[22]

## C. *The Running Of Petitioner's Limitations Period*

 Under *Shelby* and *Redd*, the limitations period for Ground Six commenced running when Petitioner admittedly received notice of the Board's denial of his administrative appeal. As noted above, while the Court must presume that notice was received some time prior to September 14, 1995, the actual date is unknown.

With respect to convictions that predate AEDPA and its newly-enacted statute of limitations, a state prisoner's limitations period began to run no earlier than the date on which AEDPA became effective, i.e., April 24, 1996. *Patterson*, 251 F.3d at 1245. Here, although Petitioner challenges a parole rescission decision rather than a state court conviction, there is no reason why the foregoing rule would not apply in this case, i.e., in Petitioner's favor. Therefore, although the factual predicate for Ground Six became known to Petitioner in 1995, prior to the enactment of AEDPA, his limitations period for the claim would not have commenced running until April 25, 1996, and he would have had until at least April 24, 1997, in which to file a timely federal habeas petition based on that habeas claim. *Id.* at 1246.

After receiving notice of the Board's denial of his appeal in 1995, Petitioner com-

---

**22.** Significantly, even if the Court could accept Petitioner's contention that the September 25, 2002 issuance of *McQuillion* started the running of his limitations period for Ground Six, Petitioner did not seek federal habeas relief within 365 days, i.e., by September 25, 2003.

Petitioner's assertion that he wished to "avoid piecemeal litigation" (Petition at 19; Traverse at 8), and therefore waited until he had exhausted Grounds One through Five, does not establish any basis for tolling or delaying the accrual of the limitations period for Ground Six. Grounds One through Five are based on a *different* parole decision, namely, the Governor's 2004 rescission decision. Petitioner could, and should, have

sought Section 2254 habeas relief for the 1995 Board rescission decision through a timely federal habeas petition directed to that decision and then, once Grounds One through Five were exhausted, filed a separate Section 2254 petition based on the Governor's 2004 rescission decision. Because the 1995 rescission decision and the 2004 rescission decision constitute separate "judgments" for purposes of Section 2254(a), they should have been challenged through separate Section 2254 habeas petitions; doing so would not have implicated the Section 2244(b) second or successive petition limitations. Indeed, the instant Petition improperly combines claims based on these two separate "judgments."

menced seeking state habeas relief on an unknown date in 1995, through a trial court habeas petition, which was denied on an unknown date. He then sought habeas relief in the California Court of Appeal, through a petition filed on September 14, 1995, and denied on December 13, 1995. After a year passed, he sought habeas relief in the California Supreme Court, through a petition filed on January 6, 1997, and denied on June 11, 1997.

■■■ 28 U.S.C. § 2244(d)(2) contains a statutory tolling provision, which suspends the limitations period for the time during which a "properly-filed" application for post-conviction or other collateral review is "pending" in state court. Additionally, in appropriate circumstances, applications for state post-conviction relief filed in an upward progression may be deemed "pending," for purposes of Section 2244(d)(2), "even during the intervals between the denial of a petition by one court and the filing of a new petition at the next level, if there is not undue delay." *Biggs v. Duncan*, 339 F.3d 1045, 1046 (9th Cir.2003); *see also Saffold*, 536 U.S. at 217–25, 122 S.Ct. at 2137–41 (holding that for purposes of California's "original" habeas petition system: "pending" covers the time between the denial of a petition in a lower court and the filing, "within a reasonable time," of a "further original state habeas petition in a higher court").

As noted earlier, neither party has presented copies of the state habeas petitions pending and denied in the 1995 through 1997 period. The Court, thus, does not know whether or not the state courts found the petitioner to be "properly-filed." Respondent posits that, if Petitioner is given the greatest benefit of doubt, the Court could assume, *arguendo*, that Petitioner immediately sought state habeas relief once he received such notice *and* would be entitled to continuous statutory tolling until the California Supreme Court's order denying relief became "final," i.e., on July 11, 1997,[23] with his limitations period for Ground Six to run for 365 days commencing on July 12, 1997. Because proceeding on this assumption favors Petitioner, for argument's sake, the Court will do so.

Applying statutory tolling pursuant to this assumption effectively would delay the commencement of Petitioner's limitations period to July 12, 1997, because Petitioner would receive continuous tolling commencing in 1995, and running through July 1997—a date some months after his limitations period otherwise would have expired (i.e., April 24, 1997). Further, under this assumption, Petitioner's limitations period did not expire until July 11, 1998, rather than on the April 24, 1997 date otherwise presumptively applicable. Nonetheless, even under this generous scenario, Ground Six remains substantially untimely, as the instant Petition was not filed until November 2, 2004.[24]

Because Ground Six was not raised in this Court until over six years after Petitioner's limitations period for the claim expired under even the most liberal and generous of assumptions, Ground Six is untimely.[25] Accordingly, Ground Six should be dismissed with prejudice.

**23.** Under California law then in effect, the California Supreme Court's June 11, 2007 order denying relief did not become "final" for 30 days, for purposes of Section 2244(d)(2) tolling. *Bunney v. Mitchell*, 262 F.3d 973, 974 (9th Cir.2001).

**24.** The Petition was mailed by someone outside prison on October 26, 2004. Thus, Petitioner is not entitled to receive the benefit of the "mailbox rule." However, even if the Petition could be deemed "filed" as of the October 26, 2004 mailing date, it nonetheless would remain substantially untimely as to Ground Six.

**25.** Petitioner, who now is represented by counsel, does not contend that he is entitled to receive equitable tolling with respect to Ground Six. No basis for applying the equita-

## RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the District Judge issue an Order:

(1) accepting and adopting the Report and Recommendation;

(2) denying the Petition with respect to Grounds One and Four;

(3) dismissing Ground Six of the Petition as untimely;

(4) granting the Petition with respect to Grounds Two, Three, and Five and directing that a writ of habeas corpus issue as follows: The Board's August 27, 2003 decision, granting Petitioner parole, is reinstated. Respondent shall release Petitioner from custody within 30 days of the entry of judgment in this case, subject to the conditions of parole imposed by the Board at Petitioner's August 27, 2003 parole consideration hearing. The California Department of Corrections and Rehabilitation shall calculate Petitioner's term of parole and shall credit his incarceration from the date his parole release date became final to his period of parole supervision.

ble tolling doctrine exists on the present rec- ord.